**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TRAVIS LASKO,        )
       )
       Plaintiff,        )
       )
v.        )       Civil Action No. 12-1421
       )
LEECHBURG POLICE DEPARTMENT;        )       Judge Mark R. Hornak
OFFICER JAROD BENNIS;        )
MICHAEL DIEBOLD;        )
THE BOROUGH OF LEECHBURG;        )
AND THE DISTRICT ATTORNEY'S        )
OFFICE OF ARMSTRONG COUNTY        )
       )
       Defendants.        )

## OPINION

**Mark R. Hornak, United States District Judge**

In this civil rights action filed under 42 U.S.C. § 1983, the Plaintiff, Travis Lasko, alleges

that the two remaining Defendants, Police Chief Michael Diebold ("Diebold") and the Borough

of Leechburg (the "Borough"), violated his rights under the Fourth and Fourteenth Amendments

to the United States Constitution when they arrested him, searched his home, and prosecuted him

for possession of narcotics and a firearm. At the center of the dispute are two questions: (1)

whether the Plaintiff's federal constitutional rights were violated; and (2) if so, whether Diebold

and the Borough can be held liable for that violation.[1]

Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 50, in

which the remaining Defendants seek judgment in their favor on the remaining claims. The

Court has carefully considered Defendants' Motion; Defendants' Brief in Support, ECF No. 51;

Defendants' Concise Statement of Material Facts, ECF No. 52; Plaintiff's Response ECF No. 55;

---

[1] A negative answer to question one would eliminate the need to address question two.

Plaintiff's Concise Statement of Material Facts, ECF No. 56; Plaintiff's Brief in Opposition, ECF No. 57; Defendants' Reply Brief, ECF No. 58; Defendants' Response to Plaintiff's Concise Statement of Material Facts; and all relevant supporting Exhibits. For the reasons that follow, Defendants' Motion is granted.[2]

## I. BACKGROUND

Because the facts were laid out in detail in the Court's earlier Memorandum Opinion denying in part and granting in part Defendants' Motion to Dismiss, *Lasko v. Leechburg Police Dep't*, No. 12-1421, 2013 WL 2404145 (W.D. Pa. May 31, 2013), only a partial recitation of the factual background is provided here.

On September 8, 2006, Officer Bennis of the Leechburg Police Department was on patrol and received a call about a domestic disturbance. Officer Bennis responded to the call around 1:00 o'clock in the morning. ECF No. 56-4, at 8. He spoke with Sue Ward, the Plaintiff's then-girlfriend, and Stefan Houser, Sue Ward's son. At that initial meeting, Ward first told Officer Bennis that Plaintiff had threatened Houser with a knife and then, during the same conversation, that Plaintiff had threatened Houser with a gun. ECF No. 56-5, at 6. Initially, Ward told Bennis that she did not want to press charges, but later, at about 6:00 o'clock that morning (roughly five hours later), Ward and Houser came to the police station and said that they had changed their minds. ECF No. 56-4, at 8–9. Officer Bennis had them fill out written statements. In her written statement, Ward related the version of the events in which Plaintiff had threatened Houser with a gun. ECF No. 56-4, at 17. Relying on Ward's written statement (but omitting her previous oral statement about the knife), Bennis wrote the following in his Affidavit of Probable Cause for a Search Warrant:

---

[2] The claims against the Leechburg Police Department, Officer Jarod Bennis, and the Armstrong County District Attorney's Office were previously dismissed. ECF No. 31.

At this time Lasko went back into the house and came back outside holding a small, white and black hand gun. Lasko then pointed the gun at Houser and said he was going to "shoot him." Houser and Ward left and returned to their home at 216 Main St. in Leechburg.... Examination of Laskos [sic] criminal history indicates that he is a convicted felon and is not permitted to possess a firearm.

ECF No. 56-1, at 2.

Chief Diebold came in for his shift later that morning, and he and Bennis filed charges against the Plaintiff. ECF No. 56-4, at 6. They obtained an arrest warrant[3] for the Plaintiff and a search warrant for "A small black and white hand gun of unknown caliber." ECF 56-1, at 1. That same morning, Diebold and Bennis went to Plaintiff's house and arrested him. ECF No. 56-4, at 6. Following the arrest, officers from the Department went to the second floor of the house where they spotted a potted marijuana plant in plain view. ECF No. 56-5, at 3. The officers then obtained a second search warrant to search for the presence of drugs in the house. During the second search, the officers found the black and white handgun, along with marijuana, cocaine, and drug paraphernalia. ECF No. 56-5, at 3. Plaintiff was charged with possession of a controlled substance, possession with the intent to manufacturer or deliver a controlled substance, possession of marijuana, possession of drug paraphernalia, and possession of a firearm. ECF No. 56-5, at 2.

At Plaintiff's preliminary hearing on December 13, 2006, Ward changed her story about Plaintiff's threats against Houser. ECF 56-4, at 16. This time, Ward said that because it had been dark outside, she and Houser had mistakenly thought the Plaintiff was holding a handgun when he had actually been holding a cell phone. ECF 56-2, at 4. On December 18, 2006, Bennis filed a criminal complaint against Ward for making false reports to law enforcement. ECF No. 56-2. In the affidavit of probable cause against Ward in support of that criminal complaint,

---

[3] Although Plaintiff has produced a copy of the search warrant, he has failed to produce a copy of the arrest warrant and apparently does not challenge the validity of the arrest warrant here. A review of the Complaint, ECF No. 1, reveals its focus on the alleged unconstitutional search and seizure, *id.* at ¶¶ 25–27, 29–33, 36–39, 43, 47, 61, 68.

Bennis stated that Ward first reported that Plaintiff had a knife, and then reported that Plaintiff had a gun, not a knife. ECF No. 56-2. The affidavit also stated that Ward and her son were initially uncooperative and unwilling to provide a written statement. ECF No. 56-2.

The subsequent procedural history is complex but not directly pertinent here.[4] Ultimately, in relation to a retrial on the criminal charges brought against him, Plaintiff filed a suppression motion and the state trial court held argument on that motion on July 22, 2011. ECF No. 56-4. As this Court's previous opinion explained:

> Plaintiff filed a suppression motion and the trial court held argument on the motion on July 22, 2011. [ECF No. 56-5]. On October 27, 2011, the trial court held that, based on the case of *Commonwealth v. Antoszyk*, [985 A.2d 975 (2009), *aff'd by an equally divided court*, 38 A.3d 816 (2012)], in which material misstatements rendered a search warrant invalid, there was a lack of independent probable cause for the first search warrant and arrest warrant due to Ward's misstatements regarding the alleged gun. [ECF No. 56-5]. Consequently, the court held that the second search warrant was the fruit of a poisonous tree. The trial court also held that the police search incident to Plaintiff's arrest, which led to the discovery of the marijuana on the second floor, was overly broad. *Id.* Thus, the trial court held that the evidence found pursuant to the second warrant was not discovered by means sufficiently distinguishable to purge that evidence of the primary taint of the first warrant. *Id.*

*Lasko*, 2013 WL 2404145, at *3.

Because this § 1983 action has its origins in the Pennsylvania state court's suppression order, a few words about that court's reasoning are in order. The state court relied strictly on Pennsylvania law in determining that the first search warrant was invalid and that the evidence was therefore suppressible. ECF 56-5, at 7. As the trial court explained, "[t]he Pennsylvania Superior Court recently held that under Article I, Section 8 of the Pennsylvania Constitution, material misstatements made deliberately or knowingly in an affidavit of probable cause will render a search warrant invalid unless there is an independent basis for a finding of probable cause." ECF No. 56-5, at 7 (citing *Antoszyk*, 985 A.2d 975). The trial court relied on *Antoszyk*

---

[4] A full recitation of the facts can be found in the Court's earlier Memorandum Opinion denying in part and granting in part Defendants' Motion to Dismiss, *Lasko*, 2013 WL 2404145.

4

as supporting the proposition that, if a confidential informant's material misstatements are the sole basis for a finding of probable cause, then the search warrant is invalid, even if the fact that they were misstatements only comes to light after the warrant has issued. *See* ECF No. 56-5, at 8–9. Thus, the trial court reasoned that if Ward's misstatements regarding the handgun were removed from the affidavit of probable cause—if the affidavit instead reflected Ward's final story that Plaintiff was merely holding a cell phone—then probable cause disappeared. ECF No. 56-5, at 9. On this basis, the trial court suppressed the evidence. After that, the Armstrong County D.A.'s Office filed an interlocutory appeal of the suppression order. On September 7, 2012, the Pennsylvania Superior Court issued an order affirming the October 27, 2011 suppression order.

Plaintiff then brought this § 1983 action against five parties: Officer Bennis, the Leechburg Police Department, the District Attorney's Office of Armstrong County, Police Chief Michael Diebold, and the Borough of Leechburg. In its previous Memorandum Opinion in this case, the Court dismissed the claims against three of the five Defendants (Officer Bennis, the Leechburg Police Department, and the District Attorney's Office of Armstrong County), leaving only Police Chief Michael Diebold and the Borough of Leechburg as Defendants. ECF No. 31. The surviving claims against those two Defendants are for violations of the Plaintiff's Fourth and Fourteenth Amendment rights. The basis of those claims is that the remaining Defendants failed to train and supervise Officer Bennis, which resulted in the alleged violation of Plaintiff's federal constitutional rights. On August 14, 2014, the Defendants moved for Summary Judgment. ECF No. 50.

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "In considering a motion for summary judgment, a court must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party." *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 162 (3d Cir. 2001). "When there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (alteration and internal quotation marks omitted). "To defeat a motion for summary judgment, the nonmoving party must raise more than some metaphysical doubt as to the material facts, and the court must determine that a fair-minded jury could return a verdict for the nonmoving party on the evidence presented." *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011) (internal citations, alterations, and quotation marks omitted).

## III.   DISCUSSION

### A.   Municipal Liability

Section 1983 does not create substantive rights but "provides a federal cause of action for the violation of a federal right." *Dique v. New Jersey State Police*, 603 F.3d 181, 189 (3d Cir. 2010). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). A plaintiff may

bring a § 1983 action against a municipality for failure of the municipality to train its employees but "only where that failure amounts to 'deliberate indifference to the constitutional rights of persons with whom the police come in contact.'" *Doe v. Luzerne Cnty.*, 660 F.3d 169, 179–80 (3d Cir. 2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (alterations omitted). "In other words, a municipality can only be liable under § 1983 where the failure to train demonstrates a 'deliberate' or 'conscious' choice by the municipality." *Id.* (quoting *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 324 (3d Cir. 2005)). For a municipality's failure to train to be a deliberate or conscious choice, the plaintiff must demonstrate that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999). "Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." *City of Canton*, 489 U.S. at 391.

A condition precedent to municipal liability is that the plaintiff actually allege a federal constitutional violation. After all, to state a claim under § 1983, a plaintiff "must establish that a state actor engaged in conduct that deprived him of 'rights, privileges, or immunities' secured by the constitution or laws of the United States." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000). In this case, the alleged underlying constitutional violation is stated in Plaintiff's Brief in Opposition to the Motion for Summary Judgment:

> In this case, Plaintiff alleges that Defendants violated his rights under the Fourth and Fourteenth Amendments as his initial arrest[5] was not based upon probable cause nor were

---

[5] As noted above, Plaintiff's Complaint challenges a search and seizure, not an arrest. Plaintiff cannot, in effect, amend his Complaint via his Brief in Opposition to Defendants' Motion for Summary Judgment. *See, e.g., Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc.,* 836 F.2d 173, 181 (3d Cir. 1988) (a plaintiff may not amend her complaint through arguments in a brief in opposition to a motion for summary judgment; "[i]t is one thing to set

the search warrants issued and upon which the charges against the Plaintiff rested were not based upon probable cause but rather arose as a result of police misconduct arising from the lack of adequate supervision and training of Officer Bennis which resulted in the unjust conviction and incarceration of the Plaintiff.

ECF No. 57, at 8. In other words, even though the claims against Officer Bennis were dismissed on qualified immunity grounds, his alleged violation of the Plaintiff's Fourth and Fourteenth Amendment rights proceeded out of a failure to train on the part of Chief Diebold and the Borough of Leechburg, or so says the Plaintiff. Plaintiff points to *Gilles v. Davis*, 427 F.3d 197, 207 n.7 (3d Cir. 2005), for the proposition that "[a] supervising authority may be liable under § 1983 for failing to train police officers when the failure to train demonstrates deliberate indifference to the constitutional rights of those with whom the officers may come into contact . . . ."

If no violation of the Plaintiff's federal constitutional rights occurred, however, then Plaintiff has no claim actionable under 42 U.S.C. § 1983. *See Morrison v. Schultz*, 270 F.App'x 111, 119 n.7 (3d Cir. 2008) (finding that because the plaintiff "did not suffer any constitutional deprivation, there is no need to address whether" the Magistrate Judge "erred in dismissing his municipal liability claim"). The factual fulcrum of the case is therefore whether Officer Bennis violated Plaintiff's Fourth and Fourteenth Amendment rights at all.

Contrary to Plaintiff's averments, it is not at all self-evident that Plaintiff suffered any constitutional deprivation. While it is true that, as a result of the state court suppression hearing, the Pennsylvania trial court found that the involved search warrants violated the Pennsylvania Constitution, ECF No. 56-5, at 8–9, that decision does not mean that those same search warrants

---

forth theories in a brief; it is quite another to make proper allegations in a complaint"). Nonetheless, the probable cause analysis conducted here is parallel, and leads to the same result, both as to Plaintiff's arrest and the challenged search. The Third Circuit applies the same analysis to challenged search warrants, *see Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997), and challenged arrest warrants, *see Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000) (applying the test articulated in *Sherwood* to an arrest warrant).

violated the United States Constitution. To the contrary, Pennsylvania sets a higher bar for the validity of search warrants. In *Commonwealth v. Antoszyk*, the Superior Court made it clear that it was relying on Article I, Section 8 of the Pennsylvania Constitution and was not "limited by the federal caselaw interpreting the United States Constitution." 985 A.2d 975, 982 (Pa. Super. Ct. 2009), *aff'd by an equally divided court*, 38 A.3d 816 (2012). The *Antoszyk* court ultimately held that a search warrant violates the Pennsylvania Constitution if the affidavit for probable cause contains material misstatements by a confidential informant even though "the affidavit accurately reflect[s] what [the informant] told the detective." *Id.* at 984.

The standard used by Pennsylvania courts to determine whether a search warrant has violated the Pennsylvania Constitution is irrelevant here. To carry on, the Plaintiff must demonstrate that his rights under the Fourth and Fourteenth Amendments of the United States Constitution were violated. As for the federal standard, the Supreme Court explained in *Franks v. Delaware*, "[t]he deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant." 438 U.S. 154, 171 (1978).[6] This Court must therefore decide whether the Plaintiff's federal constitutional rights were violated by the procurement of the warrants.

---

[6] There is a good reason for this standard as explained by Justice Eakin in his dissent from the affirmation *a curia aequaliter divisae* in *Commonwealth v. Antoszyk*:

> We do not reevaluate probable cause after the search—once the warrant issues, recanted information is about as relevant as added information. The reasons to accept the veracity of the information are no more expanded by the successful search here than they are undone by the informant's *mea culpa*. Adding or subtracting information post-issuance has nothing at all to do with the validity of a warrant, absent material misrepresentations to the magistrate. Evidence learned after the issuance can neither add nor subtract to the affidavit or its sufficiency. That the information reasonably believed to be correct was "exaggerated" or a blatant fabrication invalidates neither the process nor the warrant. That the information reasonably believed is later recanted simply is not grounds to invalidate the process.

38 A.3d at 819.

## B.     The Fourth Amendment

The Third Circuit has explained that "[a] section 1983 plaintiff who challenges the

validity of a search warrant by asserting that law enforcement agents submitted a false affidavit

to the issuing judicial officer must satisfy the two-part test developed by the Supreme Court in

*Franks v. Delaware,* 438 U.S. 154, 155–56 (1978)." *Sherwood v. Mulvihill,* 113 F.3d 396, 399

(3d Cir. 1997). Under the *Franks* test, as explained in *Mulvihill,* "the plaintiff must prove, by a

preponderance of the evidence, (1) that the affiant knowingly and deliberately, or with a reckless

disregard for the truth, made false statements or omissions that create a falsehood in applying for

a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of

probable cause." *Id.*[7]

### i.     Step One: False Statement or Omission

The first step of the test requires the Court to determine whether the original Affidavit

contains recklessly false statements or omissions. The Third Circuit explained the standards for

false assertions or omissions:

> Assertions are made with reckless disregard when, "viewing all the evidence, the affiant
> must have entertained serious doubts as to the truth of his statements or had obvious
> reasons to doubt the accuracy of the information he reported." [*Wilson,* 212 F.3d] at 788
> (internal quotations omitted). Assertions can be made with reckless disregard for the
> truth "even if they involve minor details—recklessness is measured not by the relevance
> of the information, but the demonstration of willingness to affirmatively distort truth."
> *Id.* "[O]missions are made with reckless disregard for the truth when an officer
> recklessly omits facts that any reasonable person would know that a judge would want to
> know" in making a probable cause determination. *Id.* at 783.

*Reedy v. Evanson,* 615 F.3d 197, 213 (3d Cir. 2010). The case before the Court deals strictly

with an omission. The Third Circuit has acknowledged that because "[a]ll storytelling involves

an element of selectivity . . . [w]e cannot demand that police officers relate the entire history of

---

[7] As noted above, the Third Circuit has also applied this analysis to challenged arrest warrants. *See Wilson v. Russo,*
212 F.3d 781, 786 (3d Cir. 2000).

events leading up to a warrant application with every potentially evocative detail . . . ." *Wilson v. Russo*, 212 F.3d 781, 787–88 (3d Cir. 2000). "Rather, a court employs the 'common sense approach' of only looking to the omissions that are 'highly relevant.'" *McGriff v. Marks*, No. 12-63, 2013 WL 1830948, at *10 (W.D. Pa. Apr. 30, 2013) (quoting *Wilson*, 212 F.3d at 788). However, "one of the reasons for requiring a neutral magistrate to evaluate probable cause is that an uninterested party is presumably better suited to review and evaluate the facts than an officer pursuing a lead." *Wilson*, 212 F.3d at 787. For that reason "a police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence." *Id.* A court should find that "omissions are made with reckless disregard if an officer withholds a fact in his ken that any reasonable person would have known that this was the kind of thing the judge would wish to know." *Id.* at 788 (alterations and internal quotation marks omitted). Furthermore, in making this determination, the court should view the facts not "from the deliberately slanted perspective that summary judgment demands" but rather "with scrupulous neutrality." *Reedy*, 615 F.3d at 232 n.24 (3d Cir. 2010).

So what kinds of omissions qualify? In *Wilson v. Russo*, the Third Circuit addressed four omissions in a warrant application:

> Wilson alleges that Russo made the following omissions in his warrant application: (1) he did not tell the judge that although Officer Lipp's investigative report stated that the robber was between 6'3" and 6'5", Wilson's driver's abstract indicated that he was 5'11"; (2) he did not tell the judge Druce did not pick Wilson out of an array; (3) he did not tell the judge that in the photo array, Wilson looked ethnically different from the others; and (4) he did not mention that height and weight were not indicated on the photo array.

212 F.3d at 788. The court found that "[a]ny reasonable person would know that the significant height differential, and the fact that an eyewitness-victim did not identify Wilson, were the kind of things the judge would wish to know." *Id.* (alterations and internal quotation marks omitted).

The Court also found, however, that an officer could not "be expected to communicate the apparent ethnicity of the victim, or slight variations in appearance on the photographic line-up" or "the fact that height and weight were not listed on the photo array . . . ." *Id.* The court reasoned that "a police officer cannot be expected to present a judge with complete background." *Id.*

In *Cummings v. City of Philadelphia*, 137 F. App'x 504, 505 (3d Cir. 2005), the Third Circuit affirmed a district court's finding that a detective had exhibited a reckless disregard for the truth when he failed to include certain exculpatory details in his application for a search warrant. The search warrant arose out of a complaint in which a man had allegedly "scream[ed] out [a] window 'listen you little bitch, tell your mother to give me my grandson back, or I'll kill her'" and "fired a gun at her three times." *Id.* (alterations omitted). The day after the alleged incident, the detective "interviewed the crossing guard who was working at the time of, and in the same vicinity as, the shooting," but "[t]he crossing guard did not recall anything out of the ordinary occurring the previous day." *Id.* The detective also failed to find gun shells at the scene of the alleged incident. *Id.* The detective then submitted an affidavit of probable cause in support of the issuance of the arrest warrant but did not include these mitigating factors. *Id.* The court concluded that "the omissions were made with reckless disregard for the truth." *Id.* at 506.[8] *See also United States v. Jacobs*, 986 F.2d 1231, 1234–35 (8th Cir. 1993) (finding that an officer who stated that a dog showed "interest" in the defendant's bag but failed to inform the magistrate judge that the dog had not gone into "alert" showed reckless disregard for the truth because the omitted material was "clearly critical to the finding of probable cause") (internal quotation marks omitted); *Spiess v. Pocono Mountain Reg'l Police Dep't*, No. 10-287, 2013 WL

---

[8] The *Cummings* court ultimately found, however, that these omissions were not material because the "exculpatory facts are insufficient to vitiate the probable cause established by the inculpatory evidence." 137 F. App'x at 506.

1249007, at *9 (M.D. Pa. Mar. 26, 2013) (finding that "defendants' failure to include the victim's recent history of reporting unfounded rape allegations may demonstrate a reckless disregard for the truth").

In other cases, courts have found that omissions do not exhibit a reckless disregard for the truth. In *United States v. Eberle*, 266 F. App'x 200 (3d Cir. 2008), a panel of the Third Circuit addressed a detective's factual omission in an affidavit of probable cause. The affiant in the case, Detective Lynn, ran a forensic exam on a rental computer that she believed the defendant, Mrs. Eberle, had formerly used to store images of child pornography. *Id.* at 202. The exam produced no images of child pornography or evidence that the defendant had even used the computer, and so the investigation was closed. *Id.* This had taken place in August 2004. *Id.* Seven months later, Detective Lynn received a report that the Eberles had sexually assaulted a minor and created video and photographic images of it. *Id.* The detective obtained a search warrant in March 2005 with an affidavit that included the same explanation as that found in the earlier affidavit of probable cause. *Id.* at 203. This second warrant omitted any reference to Detective Lynn's prior search of the rented computer and its failure to reveal any images of child pornography. *Id.* A forensic search of the computer seized as a result of the second warrant produced 66 images of child pornography. *Id.* On appeal, the defendant argued that the evidence should be suppressed on the grounds that Detective Lynn's omission of her fruitless search following the issuance of the first search warrant constituted a reckless disregard of the truth. The Third Circuit disagreed:

> Here, the evidence supports the District Court's conclusion that Detective Lynn did not willfully or recklessly omit the challenged information. Detective Lynn testified that she omitted information about the prior warrant and search of the computer because she believed that the computer she had searched did not belong to the Eberles. She explained that when she ran a search for their names, she did not find any images or any information leading her to believe that the Eberles had ever used the computer, and that,

> because they had changed computers since 2001, they may have retained downloaded images on storage devices other than the computer's hard drive. Based upon Detective Lynn's testimony, the District Court concluded that she held a good faith belief that the computer did not belong to the Eberles, "given the computer's apparent lack of connection" to them. Given this good faith belief, it does not follow that a reasonable person would know in March of 2005 that a search of a different computer more than six months earlier would be something a judge would want to know.

*Id.* at 204-05. The Third Circuit also noted that, despite Detective Lynn's belief regarding the computer that was the subject of the first search warrant, "[t]he District Court concluded, nevertheless, that the computer had belonged to them." *Id.* at 204 n.2. The implication of this seems to be that, even though the prior search of the computer was relevant (as exculpatory evidence—the first computer was clean, after all), the detective's reasoned and good faith belief that it was not relevant prevented a finding that the omission was made in reckless disregard for the truth.

Perhaps even more on point is *United States v. Williams*, 718 F.3d 644 (7th Cir. 2013), in which the Seventh Circuit concluded that the district court had not abused its discretion in finding that officers had not acted with reckless disregard when they omitted several facts (including inconsistent statements of a confidential informant, or "C.I.") from an affidavit of probable cause. The affidavit included a statement by the C.I., Bell, in which Bell said he had been in the Chicago house of the defendant, Williams, on April 8. *Id.* at 647. This statement, though included in the affidavit, was inconsistent with a previous statement of Bell, who "initially said he was last at Williams' apartment three or four days prior and that Williams had left for California on the 8th." *Id.* at 652. The Defendant, Williams, argued that the affidavit's reference to a controlled drug buy on April 8 was false and constituted a reckless disregard for the truth because, in a telephone call with Bell, Williams himself had stated (during a phone call monitored by the police) that he was in California, not Chicago. *Id.* at 646. Thus, "[i]f the police

knew that Williams was in California on the 8th, then they could not have believed that Bell bought drugs from Williams in Chicago that same day." *Id.* at 652. Despite this inconsistency, the Seventh Circuit found that "[o]n this record, it is not clear that the police actually believed Williams was in California, so we conclude that the district court did not clearly err in finding that the police did not recklessly disregard the truth." *Id.* The agent, who was aware of the inconsistent statements about when the C.I. had last been at the defendant's house in Chicago, testified at a *Franks* hearing that he "included the April 8 date because it was the date he believed to be 'true and accurate' based on the tone of the monitored phone call Bell had with Williams." *Id.* The agent "also testified that his experience with criminals lying to each other made him skeptical that Williams was in fact in California, so he did not believe that an April 8 meeting was impossible." *Id.* On the basis of this testimony by the agent, the Seventh Circuit held: "Once Bell told [the] Agent [] that he met Williams on April 8, the district court could reasonably find that [the] Agent [] believed that Bell had actually met Williams on April 8." *Id.*

The Seventh Circuit addressed other omissions in *Williams* as well. The defendant argued that "the affidavit did not state the following: (1) Bell was currently under arrest for illegally buying firearms; (2) Williams was in California; or (3) Bell made inconsistent statements about the guns he saw in Williams' apartment and when he had last seen drugs in Williams' apartment." *Id.* at 653. The defendant argued that "[t]hese omissions gave the false impression that Bell made consistent statements to the police and that there were no reasons to doubt his credibility," and, furthermore, that "experienced law enforcement officers know that omitting facts that would give significant reasons to doubt Mr. Bell's truthfulness would provide the magistrate with an inaccurate impression of Mr. Bell and the information he provided." *Id.* (alterations and internal quotation marks omitted).

The Seventh Circuit addressed each contention in turn. First, the omission regarding Bell's arrest was not "deliberately or recklessly deceptive" because, while the affidavit did not state that Bell had been arrested, the affidavit included reference to the fact that Bell had been buying marijuana from the defendant for six years and had purchased three pounds of it the week before. *Id.* Therefore, "the statements about the significant recent drug purchases could easily be read as giving the impression that the police were not trying to hide the fact that Bell was currently in trouble with the law." *Id.* Second, the omission regarding Williams' presence in California (not Chicago) was "not clearly made with reckless disregard for the truth or deceptive intent" for the following reasons:

> At the *Franks* hearing, [the] Agent [] testified that he believed it possible that Williams had lied to Bell about his whereabouts and that Williams was actually still in Chicago. In the context of the rapidly developing investigation, Bell's statement that Williams was in California was far from indisputable proof of this fact. [The Agent]'s experience led him to question the information Williams provided to Bell, and in making this judgment, he did not disregard more probative evidence that might have existed but of which he was not aware, such as a flight itinerary or an eyewitness placing Williams in California. On these facts, it was not unreasonable for the district court to conclude that [the] Agent [] did not entertain serious doubts that he was excluding material information from the warrant.

*Id.* at 653–54. Finally, the Seventh Circuit found that the omission regarding the inconsistent statements about the guns seen in the defendant's house did not recklessly disregard the truth. *Id.* at 654. The C.I. first reported to the police that he had seen two 9–millimeter pistols in the defendant's closet, and he later testified that he had seen two .40–caliber pistols in the closet. *Id.* The court reasoned that "[t]he difference between a .40–caliber and a 9–millimeter pistol is only one millimeter in barrel diameter." *Id.* As for the omission about when Bell had last seen drugs in Williams' house, the court acknowledged that it was "more significant" but concluded that "it was not clear evidence of reckless disregard for the truth for the officers to include only the April 8 date in the affidavit." *Id.* Ultimately, there was "reasonable support for the district court's

finding that the officers' mistakes were the product of time and negligent haste rather than reckless disregard for the truth." *Id.*

In this case, the Court must decide whether, viewed not through the normal summary judgment slant, but with scrupulous neutrality, Ward's initial statement—that Plaintiff had threatened Ward's son "with a knife"—should have made the final cut of Officer Bennis's affidavit for probable cause. Stated differently, would *any* reasonable person have known that a judge would want to hear that detail? After a review of the record (and keeping in mind the kinds of omissions that the above-cited cases found to be in reckless disregard for the truth and those that were not), the Court cannot conclude that *any* reasonable person would have known that he must include the detail about the knife.

Let's look at what information Officer Bennis had the morning he filed the application for the search warrant. First, he knew, based on his initial meeting with Ward and Houser around 1:00 a.m. on September 8, 2006, the following details: that Houser and Plaintiff had been arguing, that they had been screaming and yelling at each other, that Plaintiff had gone into the house and returned with a dangerous weapon,[9] that Houser and Plaintiff were screaming threats at each other, that Houser threw a brick through the windshield of Plaintiff's car, and that Plaintiff came back to Ward's residence later and threw a brick at the windshield of Ward's Jeep. ECF 56-4, at 5, 31–32. Second, and importantly, Officer Bennis had the information included by Ward and Houser in their written statements, which they completed and signed around 6:00 a.m. on September 8, 2006.

Officer Bennis explained, in his subsequent Affidavit of Probable Cause against Ward for making a False Report to Law Enforcement, that Ward told the story both ways at the initial meeting: Ward claimed both that Plaintiff had made threats with a knife and that Plaintiff had

---

[9] First Ward said a knife, then, by the end of the conversation, she said a gun.

made threats with a gun. ECF No. 56-2, at 3. According to that same Affidavit, Officer Bennis then told Ward at the initial meeting "that she could file charges on Lasko for pulling the gun on her son." *Id.* Officer Bennis's testimony during cross-examination at the suppression hearing explains why he included Ward's statement about the gun and not about the knife:

> Q: So you knew at the time on September 8th that at the very least Ms. Ward's statement that she gave you was unreliable; right?

> A: Yes. Until she gave me the written statement, signed it. At that time, it's written, signed, and that's what she's going with.

> Q: But at the time she gave you the statement on September 8th, you heard two, three different versions of her story; right?

> A: Yes.

> Q: And you just said that it convinced you that at the very least, the statement she was giving was unreliable?

> A: I wouldn't say unreliable. I have to go by what she writes down and signs for.

ECF 56-4, at 18.

It is not unfathomable that Ward, who had been in a long-term relationship with the Plaintiff, would, upon first encountering the police, tell a slightly different and subdued version of the story, especially considering that Plaintiff was a felon prohibited from possessing a gun. As Officer Bennis reasonably explained, he went with the final version, the one that was written down and signed by Ward several hours after his first interaction with her. Moreover, Officer Bennis testified at the suppression hearing that, on the morning he filled out the affidavit for probable cause, he had no reason to doubt the accuracy of Ward's statements as reflected in her

written statement. ECF No. 56-4, at 8–9. This testimony bears a striking similarity to the testimony provided by the detective in *United States v. Eberle*, who "testified that she omitted information about the prior warrant and search of the computer because she believed that the computer she had searched did not belong to the Eberles." 266 F. App'x at 204. Officer Bennis believed Ward's written statement that Lasko had threatened Houser with a gun. This is not necessarily undercut by the initial reference to a knife the night before. In *United States v. Williams*, the court dealt with a far more serious inconsistency, but the court found that once the C.I., Bell, had told the agent that he (Bell) had met the defendant in the defendant's house on April 8 (even though he had previously provided a different date and the defendant himself had stated in phone call that very day that he was in California, not Chicago), "the district court could reasonably find that [the] Agent [] believed that Bell had actually met Williams on April 8." 718 F.3d at 652.

That Ward first identified a knife and then a gun is simply not in the same category as: not telling the judge that an eyewitness could not identify the accused (*Wilson*), that a crossing guard heard nothing "out of the ordinary" in the face of claims of multiple gunshots and a screamed death threat (*Cummings*), that a drug-snooping dog actually had *not* "alerted" to the accused's bag (*Jacobs*), or a long history of unfounded rape allegations by the informant (*Spiess*). Rather, this case more closely resembles the facts of *Williams*. As in *Williams*, "[i]n the context of the rapidly developing investigation," Ward's initial statement that Lasko had a knife instead of a gun "was far from indisputable proof of this fact." 718 F.3d at 653. Ward's quickly-amended claim that Lasko had a gun can be seen as part of a developing investigation in which Officer Bennis soon elicited the true facts—namely, that Lasko actually had a gun instead of a knife. This case bears even more similarity to *Williams* when one considers that the stated

justification for the omission in *Williams* was that the agent's "experience led him to question the information Williams provided." *Id.* Likewise, Officer Bennis candidly admitted that, up to the point of signing a written statement, stories change, but once "it's written, signed . . . that's what she's going with." ECF No. 56-4, at 18. It can thus be fairly said of Officer Bennis that he "did not entertain serious doubts that he was excluding material information from the warrant." *Williams*, 718 F.3d at 654. Viewing these facts from a point of scrupulous neutrality, the Court cannot say that "*any* reasonable person" would have known that a judge issuing a search (or arrest) warrant necessarily would have wanted to know of Ward's earlier reference to the knife.

### ii. Step Two: Materiality

Even if the Court would conclude that Officer Bennis omitted the knife detail from his probable cause affidavit in reckless disregard for the truth, Plaintiff's claim would still fail to demonstrate that the omission was "material, or necessary, to the probable cause determination." *Wilson*, 212 F.3d at 789. In making the materiality determination, a court must perform "reconstructive surgery" on the original affidavit by first "excis[ing] offending inaccuracies and insert[ing] the facts recklessly omitted, and then determin[ing] whether or not the 'corrected' warrant affidavit would establish probable cause." *Id.* At this stage, the Court "engage[s] in the routine probable cause analysis, weighing the inculpatory evidence against any exculpatory evidence available to the officer." *Id.* at 791. In conducting this weighing, the Court must return to the ordinary summary judgment standard, and consider the Corrected Affidavit as "simply . . . one more set of factual assertions that must then be viewed in the light most favorable to the non-movant." *Reedy*, 615 F.3d at 214 n.24.

Reconstructive surgery in this case results in the following affidavit (with the inserted facts in bold):

On this date, 09-08-06, this Officer was dispatched to 216 Main St. in Leechburg for two males fighting in the street. On arrival this Officer spoke with Sue Ward who stated that her son Stefan Houser and live-in boyfriend Travis Lasko got into an argument.

Ward stated that Lasko wanted to talk and "mend" things at his other house at 566 Spang Ave. in Leechburg. Houser, her son, wanted to come along for protection since Lasko had already threatened Ward earlier. When Houser and Ward got to Lasko's house he began to yell and scream at Ward and call her names.

At this time Lasko went back into the house and came back outside holding a small, white and black hand gun. Lasko then pointed the gun at Houser and said he was going to "shoot him." **[When this Officer first talked to Ward, she said that Lasko had a knife and then, during the same conversation, she said he had a gun. The next morning, when she completed her signed, written statement, she maintained that Lasko had a gun.]** Houser and Ward left and returned to their home at 216 Main St. in Leechburg. Lasko came down to 216 Main St. later and threw a brick at Ward's Jeep windshield.

Examination of Laskos criminal history indicates that he is a convicted felon and is not permitted to possess a firearm.

ECF 56-1, at 1. The initial search warrant application listed two criminal violations: a violation of 18 Pa. Cons. Stat. § 2701 (Simple Assault)[10] and a violation of 18 Pa. Cons. Stat. § 6105 (Persons not to possess firearms). Viewing these facts in the light most favorable to the Plaintiff, this Court concludes that the warrant (search or arrest) would have issued based on the affidavit as reconstructed above. As explained in *Wilson v. Russo*, "[p]robable cause exists if there is a 'fair probability' that the person committed the crime at issue." 212 F.3d at 789. "[T]he evidentiary standard for probable cause is significantly lower than the standard which is required for conviction" and "does not depend on whether the suspect actually committed any crime." *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005). "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Hill v. California,* 401 U.S. 797, 804 (1971). The fact that Ward's story changed during the first conversation does

---

[10] The Pennsylvania statute defining Simple Assault provides, in relevant part, that "a person is guilty of assault if he: (1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another; (2) negligently causes bodily injury to another with a deadly weapon; [or] (3) attempts by physical menace to put another in fear of imminent serious bodily injury . . . ." 18 Pa. Cons. Stat. § 2701.

not undermine a finding of probable cause. Viewing the Corrected Affidavit as a whole, it is quite plain that it sets out a tale involving a heated argument, yelling and screaming by Lasko at Ward, Lasko's retrieving a dangerous weapon (including several very specific references to a "small black and white handgun"), a direct threat by Lasko to shoot Houser, and Lasko whipping a brick through the windshield of Ward's Jeep. In that overall context, the added information injected into the Corrected Affidavit simply does not vitiate the probable cause finding as to the gun charge. The Corrected Affidavit paints a clear picture of an escalating offensive by Lasko with a dangerous weapon (a gun based on two conversations and a signed statement) and a brick. Even viewed in the light most favorable to Plaintiff, "no genuine issue of material fact exists as to whether the corrected affidavit supports a finding of probable cause." *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997).

Furthermore, even if the Court were to conclude that the search warrant for the "small black and white hand gun of unknown caliber" would not have issued but for Officer Bennis's omission, an arrest warrant still would have issued for the § 2701 Simple Assault charges. Plaintiff alleges nothing to undermine the probable cause to arrest Plaintiff based on Simple Assault charges.[11] No matter how you slice it, the facts show that there was a "fair probability" that Plaintiff committed that crime. For a Simple Assault charge, it does not matter whether the Plaintiff threatened Houser with a knife or a gun: probable cause existed regardless of the weapon used.[12]

---

[11] Plaintiff also fails to challenge the arrest warrant issued against him. He merely challenges the concurrently issued search warrant (and indeed, while he has placed the search warrant on the record, he has not provided the Court with a copy of the arrest warrant).

[12] As noted above, the fact that Ward changed her story three months later to say that Plaintiff had neither knife nor gun but instead a cellphone makes no difference to this Court's analysis under *Franks*. Under federal law, Ward's ultimate truthfulness is not at issue, only Officer Bennis's. At the time Officer Bennis filled out the affidavit of probable cause, no mention of a cell phone had ever been made—according to the story at that point, Plaintiff had a knife or he had a gun, but either way, he had a dangerous weapon.

Once the Officers were in Plaintiff's house (by Plaintiff's consent), ECF 56-5, at 3, they were permitted to perform a protective sweep, which is a "cursory inspection of those spaces where a person may be found," *Maryland v. Buie*, 494 U.S. 325, 335 (1990).[13] The Third Circuit has found that "the *Buie* inquiry of whether a space can hold a person is judged from the *ex ante* perspective of an objectively reasonable officer." *United States v. Snard*, 497 F. App'x 228, 232 (3d Cir. 2012) (finding that police officers' search under box spring and mattress was permissible under protective sweep exception to warrant requirement), *cert. denied*, 133 S. Ct. 1508 (2013). While it is true that a protective sweep can "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises," *Buie*, 494 U.S. at 335–36, the facts of Plaintiff's case are that the officers spotted a marijuana plant in plain view at the top of the stairs going to the second floor,[14] ECF 56-5, at 3. When they spotted the marijuana plant, the officers obtained a second search warrant. *Id.* In executing the second warrant, the officers found marijuana, cocaine, drug paraphernalia, and the black and white handgun. *Id.*

Thus, even if an arrest warrant had issued only on the basis of the violation of 18 Pa. Cons. Stat. § 2701 (and the search warrant for the gun had been denied), the Plaintiff's Fourth and Fourteenth Amendment rights would still have been not violated at that initial step or any subsequent step along the way. First, as explained above, the arrest warrant would have (and should have) issued even if the omitted material had been included in the affidavit (on Simple

---

[13] In its Opinion on the issue of suppression, the Pennsylvania trial court also relied specifically on Pennsylvania law in finding that "the protective sweep incident to Defendant's arrest exceeded the permissible scope of a protective sweep under the circumstances." As the state court explained, "[i]n Pennsylvania, areas within the arrestee's immediate control may be searched incident to an arrest to prevent danger to arresting officers and/or to prevent destruction of evidence." ECF No 56-5, at 11. This holding has no bearing on the federal standards governing protective sweeps.

[14] Officer Bennis also explained during the suppression hearing that the purpose of the sweep of Plaintiff's house was to look for "other people inside or people in there." ECF No. 56-4, at 6.

Assault grounds at the very least). Second, the officers engaged in a permissible protective sweep of the house under *Buie*. Third, the marijuana plant was in plain view. *See Horton v. California*, 496 U.S. 128, 135 (1990) ("[A]n object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant."). Finally, once the officers had seen the marijuana plant, they obtained a second search warrant (this second search warrant identifying the gun and drugs as the items to be searched for and seized), which led to the finding of the gun.

In sum, even if the Court were to conclude (which it does not) that Officer Bennis's omission was made in reckless disregard for the truth, the omission would not have been material. And even if the omission were found to be material with respect to the search warrant, the arrest warrant, which issued in part on the basis of the Simple Assault charge, was good enough, as a legal matter, to get the ball rolling. In other words, on top of everything else, the events of the day played out permissibly on a basis entirely independent to the issuance of the first search warrant.

Accordingly, the Plaintiff's federal constitutional rights were not violated as a matter of law.

## IV.  **CONCLUSION**

Because the Court concludes that Plaintiff has failed to advance sufficient record evidence that there is any genuine issue of material fact that his Fourth and Fourteenth Amendment rights were violated and the remaining Defendants are entitled to a judgment in their favor as a matter of law, his claims against Chief Diebold and the Borough of Leechburg must necessarily fail. Summary Judgment is proper, and the Court will therefore grant Defendants' Motion.

An appropriate Order will be entered.

Mark R. Hornak
United States District Judge

Dated: October 29, 2014

cc:    All counsel of record